1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

LINDA DE SANTOS,

        Plaintiff,

v.

JACO OIL COMPANY, et al.,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:14-cv-0738 -JLT

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR FINAL APPROVAL OF THE CLASS SETTLEMENT

(Docs. 37, 38)

Plaintiff, Linda De Santos requests final approval of a class settlement.  (Doc. 38)  Plaintiff also seeks an award of attorneys' fees and costs and a class representative incentive award.  (Doc. 37)  Defendants do not oppose these requests, and no class member objected.  For the following reasons, final approval of the settlement and for attorney's fees is **GRANTED.**  In addition, Plaintiff's request for an award of costs and for an incentive payment are **GRANTED IN PART**.

## BACKGROUND

Plaintiff asserts she applied for the Human Resources Manager position with Defendant Jaco Oil Company in March 2014.  (Doc. 32 at 16)  She completed the application online, "had a telephone interview and took several computer proficiency exams, all of which she passed."  (*Id.*)  In addition, Plaintiff was "asked to fill out a "Credit and Background Check Authorization" form as part of the application process."  (*Id.*)

Plaintiff "emailed Defendant Jaco on March 26, 2014, to find out the status of her application."

(Doc. 32 at 16)  That same day, Plaintiff received a response, "from the human resources department representative, Ms. Winkler, stating that she had not been selected for employment and that the position had been filled already by a candidate with a "skill set that more closely matches [Jaco's] needs." (*Id.*) According to Plaintiff, Ms. Winkler did not "indicate whether Plaintiff's consumer report was considered in the decision to deny her employment," but Plaintiff "suspected that there were negative items on her consumer report that she wanted to explain." (*Id.*)

Plaintiff emailed Ms. Winkler on April 9, 2014, requesting a copy of her consumer report and inquiring "whether the report was considered in the decision to deny her employment." (Doc. 36 at 16) Ms. Winkler did not respond, and Plaintiff sent a second inquiry on April 21, 2014. (*Id.* at 17)  In reply, Plaintiff received an email from with a copy of her consumer report, but Ms. Winkler did not answer whether Jaco considered it with Plaintiff's application. (*Id.*)  Several weeks later, Plaintiff learned Jaco had not yet filled the position for which she had applied. (*Id.*)

On May 16, 2014, Plaintiff initiated this action by filing a complaint against Jaco "individually and on behalf of all others similarly situated," including "other prospective, current, and former employees." (Doc. 1 at 2)  Plaintiff alleged Jaco's actions violated the Fair Credit Reporting Act, California's Investigative Consumer Reporting Agencies Act, and California's Consumer Credit Reporting Agencies Act. (*Id.* at 1)  Jaco filed its answer on June 16, 2014. (Doc. 7)

According to Plaintiff, in the course of discovery, her attorneys learned that Jaco performed background check services for its affiliated entities, including Fastrip Food Stores, Inc.; Fastrip Food Stores of Fresno, Inc.; Fastrip Financial, LP; Instant Storage, LLC; Brooke Utilities, Inc.; and Wholesale Fuels, Inc. (Doc. 32 at 18)  On April 8, 2015, Plaintiff filed a First Amended Complaint in which she named the affiliated entities as additional defendants in this action. (Doc. 25)

The parties engaged in private mediation with Carl West, who proposed a monetary settlement in the amount of $300,000. (Doc. 32 at 19-20)  After accepting the proposal, the parties executed a memorandum of understanding on May 12, 2015. (*Id.*)  The parties finalized the proposed settlement on June 10, 2015. (Doc. 32-1 at 57-60)  Plaintiff filed an unopposed motion for preliminary approval of the class settlement and conditional certification of the Settlement Class on June 22, 2015. (Doc. 32)

The Court granted preliminary approval of the class settlement on July 17, 2015. (Doc. 34)

Case 1:14-cv-00738-JLT   Document 41   Filed 09/29/15   Page 3 of 31

The court appointed Plaintiff as the Class Representative, and authorized Plaintiff to seek an award enhancement up to $5,000 for her representation of the class. (*Id.* at 16-17) In addition, the Court appointed the law firm of Shanberg, Stafford & Bartz LLP as the Class Counsel, and authorized Class Counsel to seek fees that did not "exceed 33 1/3% of the gross settlement amount and costs up to $8,500." (*Id.*) The Court appointed ILYM Group, Inc. as the Claims Administrator. (*Id.* at 16) On July 26, 2015, the Court approved the Class Notice that conveyed this information to Class Members. (Doc. 36) In addition, the Class Notice Packet informed Class Members of the nature of the action, the class definition approved by the Court, claims and issues to be resolved, how a Class Member could chose to be excluded from the Settlement Class, the time and method to opt-out, and the binding effect of a class judgment. (*See id.*)

The Claims Administrator mailed the Class Notice Packet to 766 Class Members identified by the parties. (Doc. 39-1 at 3, Molina Decl. ¶¶ 5-6) Of the mailed packets, 23 were undeliverable because the Claims Administrator was unable to locate a current address. (*Id.*, ¶10) Class Members were instructed to postmark any objections to the settlement or return the Request for Exclusion Form no later than September 11, 2015. (Doc. 34 at 17) The Claims Administrator received four Requests for Exclusion. (Doc. 39-1 at 4, Molina Decl. ¶11) No objections were received by the Settlement Administrator or filed with the Court. Accordingly, the Claims Administrator reports there are 762 participating class members. (*Id.* at 4, ¶13)

Plaintiff filed her motion for attorneys' fees and costs, as well as approval of a class representative incentive payment, on August 21, 2015. (Doc. 37) She filed the unopposed motion for final approval of the Settlement on August 28, 2015. (Doc. 38) Because the Court found the matters suitable for decision without oral arguments, the motions were taken under submission pursuant to Local Rule 230(g) on September 21, 2015.

## THE SETTLEMENT TERMS

Pursuant to the proposed settlement ("the Settlement"), the parties agree to a gross settlement amount up to $300,000. (Doc. 38-1 at 21, Settlement § 2.1)

### I.      Payment Terms

The settlement fund will cover payments to Class Members including "all applicants who

3

applied for employment with Jaco Oil Company, Fastrip Food Stores, Inc., Fastrip Food Stores of Fresno, Inc., Fastrip Financial, LP, Instant Storage, LLC, Brooke Utilities, Inc., and/or Wholesale Fuels, Inc. and for whom Defendants obtained and/or used a 'Consumer Report'[1] during the 'Settlement Period.'"  (Doc. 32-1 at 17, Settlement § 1.1)  In addition, the Settlement provides for payments to Class Counsel and to the Claims Administrator.  (*Id.* at 21-22; Settlement § 2.1) Specifically, the Settlement provides for the following payments from the gross settlement fund:

- The Class Representative will receive up to $5,000;

- Class Counsel will receive no more than $100,000, which equals 33.3% of the gross settlement fund and, and up to $7,250 for expenses; and

- The Claims Administrator will receive up to $10,000 for fees and expenses.

(Doc. 32-1 at 23-25, Settlement § 3; Doc. 37 at 11) After these payments have been made, the remaining money – estimated to total approximately $177,000 – will be distributed to Class Members. (*See* Doc. 32-1 at 18, Settlement § 1.5)

The funds to Class Members will be distributed to two different subclasses: class members hired by Defendants ("Group I") and class members who were not hired by Defendants ("Group II"). (Doc. 38 at 10) Class Members were not required to submit claim forms to receive a settlement share, and will be compensated as long as they did not return the Request for Exclusion.  (Doc. 38-1 at 22-23, Settlement § 2.3)  Class Members in Group I will receive $50 each, and Class Members in Group II "will receive approximately $350." (Doc. 38 at 10-11)

## II.      Releases

The Settlement provides that at the time final judgment is entered, Plaintiffs and Class Members, other than those who elect not to participate in the Settlement, release Defendants from the claims arising in the class period.  Specifically, the released claims for Class Members include:

- any and all claims regarding Defendants' alleged failure to comply with the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), or other similar state or

---

[1] Pursuant to the Settlement, "Consumer Report" includes "any credit, consumer, and/or investigative report as may be applied by the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), the Investigative Consumer Reporting Agencies Act, California Civil Code §1786, *et seq.* ("ICRAA"), the Consumer Credit Reporting Agencies Act, California Civil Code § 1785.1, *et seq.* ("CCRAA"), or any other similar state or federal laws." (Doc. 38-1 at 18, Settlement § 1.7)

federal laws, related to or arising from the alleged facts and other claims asserted in, or that could have been asserted in, the operative First Amended Complaint;

- any and all claims regarding Defendants' alleged failure to comply with the Investigative Consumer Reporting Agencies Act, California Civil Code § 1786, *et seq.* ("ICRAA"), or other similar state or federal laws, related to or arising from the alleged facts and other claims asserted in, or that could have been asserted in, the operative First Amended Complaint;

- any and all claims regarding Defendants' alleged failure to comply with the Consumer Credit Reporting Agencies Act, California Civil Code § 1785.1, *et seq.* ("CCRAA"), or other similar state or federal laws, related to or arising from the alleged facts and other claims asserted in, or that could have been asserted in, the operative First Amended Complaint; [and]

- any and all claims for declaratory relief, injunctive relief, restitution, and/or fraudulent business practices brought pursuant to the California Business & Professions Code § 17200 and related to or arising from the alleged facts and other claims asserted in, or that could have been asserted in the operative First Amended Complaint

(Doc. 38-1 at 32, Settlement § 5.2)

The release for Plaintiff encompasses more claims than the release of Class Members.  (*See* Doc. 38-1 at 30-31, Settlement § 5.3)  Specifically, Plaintiff's release provides that she releases Defendants "from any and all claims, charges, complaints, liens, demands, causes of action, obligations, damages and liabilities, known or unknown, suspected or unsuspected, that the Class Representative had, now has, or may hereafter claim to have against the Released Parties arising out of, or relating in any way to, the Class Representative's application for employment with Defendants, or otherwise relating to the Defendants or the Released Parties."  (*Id.* at 30)

III.     **Objections and Opt-Out Procedure**

The Class Notice Packet explained claims that were to be released by Class Members as part of the Settlement.  (*See* Doc. 35, Exh. 1; Doc. 36)  Any class member who wished had an opportunity to object or elect not to participate in the Settlement.  In addition, the Class Notice Packet explained the procedures for Class Members to claim object to the terms of the Settlement, or to complete and return the Request for Exclusion Form.  (*Id.*)

IV.     **Service of the Notice Packets and Responses Received**

On July 17, 2015, the Court ordered the Settlement Administrator to mail the Class Notice Packet to Class Members no later than August 13, 2015.  (Doc. 34 at 17)  ILYM Group served the

1   Class Notice Packet to the extent possible.  (*See generally*, Doc. 39-1)  The Class Notice Packets were

2   mailed on August 8, 2015, via the United States Postal Service, to the 766 Class Members identified by

3   Defendants.  (Doc. 39-1 at 3, Molina Decl. ¶¶ 6-7)

4           According to Stephanie Molina, Operations Manager for ILYM Group, 98 Class Notice Packets

5   were returned as undeliverable.  (Doc. 39-1 at 3, Molina Decl. ¶ 8)  ILYM Group attempted to locate

6   the current addresses for these individuals, and re-mailed 91 of the Notice Packets.  (*Id.*, ¶ 9)  After the

7   additional searches for correct addresses, a total of 23 Notice Packets were "deemed undeliverable,"

8   including seven for which updated addresses were not located and sixteen packets that were returned to

9   ILYM Group a second time.  (*Id.*, ¶ 10)  ILYM Group received four requests for exclusion from the

10  Settlement.  (*Id.*, ¶ 11)  No objections to the Settlement were mailed to ILYM Group (*id.* at 4, ¶ 12) or

11  filed with the Court

12          Based upon the number of Class Notice Packets successfully served and the requests for

13  exclusion received by ILYM Group, Ms. Molina reports there is "a total of 762 Participating Class

14  Members."  (Doc. 39-1 at 4, Molina ¶ 13)  "Of the 762 Participating Class Members, 312 have been

15  designated as Group I (those applicants that were hired by Defendants) and 450 have been designated

16  as Group II (those applicants that were not hired by Defendants)."  (*Id.*)

                        **APPROVAL OF A CLASS SETTLEMENT**

18  **I.      Legal Standard**

19          When parties settle the action prior to class certification, the Court has an obligation to "peruse

20  the proposed compromise to ratify both the propriety of the certification and the fairness of the

21  settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is

22  generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem*

23  *Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Second, the Court must "determine whether the

24  proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler*

25  *Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within

26  the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

27

28

## II.    Certification of a Settlement Class[2]

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all." Fed. R. Civ. P. 23(a).  Under the terms of the Settlement, the proposed class is comprised of all applicants who applied for employment with Jaco Oil Company; Fastrip Food Stores, Inc.; Fastrip Food Stores of Fresno, Inc.; Fastrip Financial, LP; Instant Storage, LLC, Brooke Utilities, Inc.; and Wholesale Fuels, Inc. and for whom Defendants obtained and/or used a Consumer Report during the relevant time period.  (Doc. 38-1 at 17, Settlement § 1.1)

Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate . . . compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b). *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  Here, Plaintiff contends that "each of the elements of both Rule 23(a) and Rule 23(b) are met."  (Doc. 38 at 14)

### A.    Rule 23(a) Requirements

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982).  Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation. *Falcon*, 457 U.S. at 156.

#### 1.    Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P.

---

[2] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification of the Settlement Class is required.

23(a)(1).  This requires the Court to consider "specific facts of each case and imposes no absolute limitations."  *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is not a specific numerical threshold, joining more than one hundred plaintiffs is impracticable.  *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) ("find[ing] the numerosity requirement . . . satisfied solely on the basis of the number of ascertained class members . . . and listing thirteen cases in which courts certified classes with fewer than 100 members").  Here, Plaintiffs reports that "Defendants' records demonstrated there are 766 Class Members," of which four elected to be excluded.  (Doc. 38 at 15; *see also* Doc. 39-1 at 4, Molina ¶ 13) Therefore, the numerosity requirement is satisfied.

### 2.   Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). Commonality "does not mean merely that [class members] have all suffered a violation of the same pro-vision of law," but "claims must depend upon a common contention."  *Wal-Mart Stores*, 131 S. Ct. at 2551.  In this case, Plaintiff asserts there are common facts in this case, because Defendants asked prospective employees, including Class Members, "to fill out a 'Credit and Background Check Authorization' form as part of the application process, which Defendants use to obtain and use the Class Members' consumer reports."  (Doc. 38 at 15)  Further, Plaintiff contends there is a common question in the action:  "whether these authorizations and uniform policies by which Defendants obtained and used applicants' consumer reports violated the FCRA, ICRAA, and CCRAA."  (*Id.*) Thus, the Court finds the commonality requirement is satisfied.

### 3.   Typicality

This requirement requires a finding that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The standards under this rule are permissive, and a claim or defense is not required to be identical, but rather "reasonably co-extensive" with those of the absent class members.  *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal

quotation marks and citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when the named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Here, Plaintiff alleged that she applied for employment with Defendant Jaco during the relevant time period.  (Doc. 1 at 4, ¶ 10; Doc. 25 at 7, ¶ 20)  Because Plaintiff was subjected to the same polices and application procedures as the Settlement Class Members, the typicality requirement is satisfied.

> 4.      Fair and Adequate Representation

Absentee class members must be adequately represented for judgment to be binding upon them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  Accordingly, this prerequisite is satisfied if the representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

> a.      Class representative

Plaintiff seeks appointment as the Class Representative of the Settlement Class, and asserts that she has "always maintained the best interest of the Class while performing [her] Class Representative duties."  (Doc. 37-2 at 6, DeSantos Decl. ¶ 13)  Further, the parties do not report that there any conflicts between Plaintiff and the putative class members.  Thus, it appears Plaintiff will fairly and adequately represent the interests of the class.

> b.      Class counsel

Shanberg, Stafford & Bartz LLP seek appointment as counsel for the settlement class. Proposed Class Counsel report that they "are experienced in litigating class action cases and in serving as class counsel."  (Doc. 38 at 16, citing Stafford Decl. ¶¶28-31)  Further, Plaintiff reports, "There are no known personal affiliations or familial relationships between the plaintiff and proposed class counsel."  (*Id.*)  Defendants do not oppose the appointment or assert Plaintiff's counsel are inadequate to represent the interest of the class.  Therefore, the Court finds the lawyers at Shanberg, Stafford & Bartz LLP satisfy the adequacy requirements.

**B.     Certification of a Class under Rule 23(b)(3)**

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.  Here, Plaintiff asserts that certification of the Class is appropriate under Rule 23(b)(3), which requires a finding that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  These requirements are generally called the "predominance" and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-mart Stores*, 131 S. Ct. at 2559 ("(b)(3) requires the judge to make findings about predominance and superiority before allowing the class").

1.     Predominance

The predominance inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  The Ninth Circuit explained, "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'"  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).  In this case, Plaintiff asserts that common issues predominate over any individual issues because "all the liability issues in this case can be determined based on common evidence, namely, that Defendants utilized a uniform background check policy as part of their application process, and uniformly obtained and used applicants' consumer reports in alleged violation of the FCRA, ICRAA, and CCRAA."  (Doc. 38 at 17-18)

2.     Superiority

The superiority inquiry requires a determination of "whether objectives of the particular class action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted).  This tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule 23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior

method of adjudication, including (1) the class members' interest in individual litigation, (2) other pending litigation, (3) the desirability of concentrating the litigation in one forum, and (4) difficulties with the management of the class action.

### a.    Class members' interest in individual litigation

This factor is relevant when class members have suffered sizeable damages or have an emotional stake in the litigation. *See In re N. Dist. of Cal., Dalkon Shield, Etc.*, 693 F.2d 847, 856 (9th Cir. 1982)).  Here, Plaintiff reports "the claimants in Group I will receive $50, and those in Group II will receive approximately $350."  (Doc. 38 at 18)  Further, no objections were made to the Settlement, and only four individuals elected to be excluded from the Settlement.  Because there is no evidence that class members are interested in pursuing their own actions, this factor weighs in favor of class certification.

### b.    Other pending litigation

According to Plaintiff, this is the only action she is aware of against Defendants involving the claims brought by Plaintiff.  (Doc. 38 at 18, citing Stafford Decl. ¶ 38)  Further, Defendants have not identified any other pending litigation.  As a result, this factor weighs in favor of certification.

### c.    Desirability of concentrating litigation in one forum

Because common issues predominate on Plaintiff's class claims, "presentation of the evidence in one consolidated action will reduce unnecessarily duplicative litigation and promote judicial economy." *Galvan v. KDI Distrib.*, 2011 U.S. Dist. LEXIS 127602, at *37 (C.D. Cal. Oct. 25, 2011). Moreover, because the parties have resolved the claims through the Settlement, this factor does not weigh against class certification.

### d.    Difficulties in managing a class action

The Supreme Court explained that, in general, this factor "encompasses the whole range of practical problems that may render the class format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  However, because the parties have reached a settlement agreement, it does not appear there are any problems with managing the action.  Therefore, this factor weighs in favor of class certification.

Because the factors set forth in Rule 23(b) weigh in favor of certification, the Settlement Class

1  is maintainable under Rule 23(b)(3).  Accordingly, Plaintiff's request to certify the Settlement Class is

2  **GRANTED.**

3  **III.    Approval of the Settlement**

4      Settlement of a class action requires approval of the Court, which may be granted "only after a

5  hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

6  Approval is required to ensure settlement is consistent with Plaintiff's fiduciary obligations to the class.

7  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985). The Ninth Circuit has identified

8  several factors to determine whether a settlement agreement meets these standards, including:

9      the strength of plaintiff's case; the risk, expense, complexity, and likely duration of
       further litigation; the risk of maintaining class action status throughout the trial; the
10      amount offered in settlement; the extent of discovery completed, and the stage of the
       proceedings; the experience and views of counsel; the presence of a governmental
11      participant;[3] and the reaction of the class members to the proposed settlement.

12  *Staton*, 327 F.3d at 959 (citation omitted).  Further, a court should consider whether settlement is "the

13  product of collusion among the negotiating parties." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 458

14  (citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)).  In reviewing the settlement

15  terms, "[t]he court need not reach any ultimate conclusions on the contested issues of fact and law

16  which underlie the merits of the dispute."  *Class Plaintiffs*, 955 F.2d at 1291(internal quotations and

17  citation omitted).

18      **A.    Strength of Plaintiffs' Case**

19      When evaluating the strength of a case, the Court should "evaluate objectively the strengths and

20  weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to

21  reach these agreements."  *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012)

22  (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig*., 720 F.Supp 1379, 1388 (D. Az. 1989)).

23      According to Plaintiff, "Defendants' background check policy facially violated the FCRA,

24  ICRAA, and CCRAA by unlawfully using authorization forms that failed to comply with each of the

25  statutes' disclosure requirements and that Defendants failed to properly notify applicants of adverse

26  actions taken after Defendants obtained and used the applicants' consumer reports."  (Doc. 38 at 20)

27

28      [3] Because there is not a government participant in this action, this factor does not weigh in the Court's analysis.

12

However, Plaintiff acknowledges that Defendants may be able to assert the violations were not willful, making it challenging to prove liability. (*Id.* at 21)  Given the challenge identified by Plaintiff, this factor weighs in favor of preliminary approval of the Settlement.

### B.   Risk, Expense, Complexity, and Likely Duration of Further Litigation

Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the proposed settlement were to be rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages.  Plaintiff contends that "[her] claims, much of which rest on a showing of technical violations, have faced judicial resistance in some courts."  (Doc. 32 at 34, citing, e.g., *Syed v. M-I LLC,* 2014 U.S. Dist. LEXIS 150748 at *8 (E.D. Cal. Oct. 22, 2014)).  On the other hand, the proposed settlement provides for immediate recovery for the class.  Thus, this factor weighs in favor of approval of the Settlement.

### C.   Risk of Maintaining Class Status throughout the Trial

Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 529.  If the settlement were to be rejected, the parties would have to engage in further litigation, including certification of a class and discovery on the issue of damages.  Plaintiff's counsel estimated that Plaintiff "had a 70% chance of certifying the claims in this case and prevailing on the merits." (Doc. 37-1 at 5, Stafford Decl. ¶ 16)  Further, she previously acknowledged that "[e]ven if Plaintiff was to prevail in certification, the costs for both parties would increase and Plaintiff would face 'substantial risk of incurring the expense of a trial without any recovery.'" (Doc. 32 at 33, quoting *In re Toys "R" Us- Dec., Inc. Fair & Accurate Credit Transactions Act (FACTA) Litigation*, 295 F.R.D. 438, 451 (C.D. Cal. 2014)).  Due to the risk to the claims of class members, this factor supports approval of the Settlement.

### D.   Amount Offered in Settlement

The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  Thus, when analyzing the amount offered in settlement, the Court should examine "the complete package taken as a whole," and the amount is "not to be

1    judged against a hypothetical or speculative measure of what *might* have been achieved by the

2    negotiators." *Id.*, 688 F.2d at 625, 628.

3           Here, Plaintiff asserts "[t]he proposed recovery for Settlement Class Members ($50 for Group I

4    members and $350-$375 for Group II members) is substantial." (Doc. 38 at 24)  She explains: "For

5    those Class Members receiving $50, that represents 50% of the potential $100 recovery. [Citations]

6    And for those Class Members in Group II, who will receive approximately $350, the recovery is

7    substantially better than many other settlements that have been approved in similar FCRA cases

8    recently." (*Id.*, internal citations omitted).  Plaintiff believes this supports approval of the settlement,

9    because the total settlement fund "represents a recovery of approximately 67%" of the total calculated

10   damages of $445,200. (*Id.* at 23)

11          Notably, "[t]he fact that a proposed settlement may only amount to a fraction of the potential

12   recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should

13   be disapproved." *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998).  Rather,

14   as noted by the Ninth Circuit, "parties, counsel, mediators, and district judges naturally arrive at a

15   reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the

16   potential recovery, and the chances of obtaining it, discounted to present value." *Rodriguez v. West

17   Publishing Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).  Based upon the parties' agreement that this

18   amount provides adequate compensation for the class claims, the Court finds the amount offered in

19   settlement supports approval of the settlement agreement.

20          **E.      Extent of Discovery Completed and Stage of the Proceedings**

21          The Court is "more likely to approve a settlement if most of the discovery is completed because

22   it suggests that the parties arrived at a compromise based on a full understanding of the legal and

23   factual issues surrounding the case." *Adoma*, 913 F. Supp. 2d at 977 (quoting *DIRECTV, Inc.,* 221

24   F.R.D. at 528).  Here, Plaintiff reports the parties engaged in discovery prior to mediation, and

25   "Defendants produced hundreds of pages of documents, including exemplar background check forms

26   used in the hiring process, company policies and procedure manuals, emails and other relevant

27   documents enabling Plaintiff to evaluate the strengths and weaknesses of her claims." (Doc. 38 at 25-

28   26, citing Doc. 37-1 at 3, Stafford Decl. ¶ 5)  Further, Plaintiff reports she "retained an expert to

14

1    prepare a damage exposure analysis to calculate the maximum amount of Defendants' potential

2    liability," and this information "formed much of the basis for the settlement negotiations." (*Id.* at 26)

3    Given the discovery completed by the parties prior to mediation, it appears that the parties made

4    informed decisions, which lead to resolution of the matter. Therefore, this factor supports preliminary

5    approval of the Settlement.

6          **F.**    **Experience and Views of Counsel**

7          Plaintiff's counsel asserts that "the Settlement fair and reasonable, and that final approval of the

8    Settlement would best serve the interests of class members because the extremely favorable result

9    achieved by the Settlement outweighs the risks and uncertainty of continued litigation, weighs strongly

10   in favor of final approval." (Doc. 38 at 27) Similarly, Defendants indicated in the Settlement that they

11   believe it "is fair, adequate, and reasonable," and a "good faith compromise of the claims raised in the

12   Litigation, based upon their assessment of the mutual risks and costs of further litigation." (Doc. 38-1

13   at 42, Settlement § 9) Given counsels' experience and familiarity with the facts, their recommendation

14   that the settlement be approved is entitled to significant weight. *Nat'l Rural Telecomms.*, 221 F.R.D. at

15   528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted

16   with the facts of the underlying litigation"); *see also Barbosa v. Cargill Meat Solutions Corp.*, 297

17   F.R.D. 431, 447 (E.D. Cal. 2013) ("In considering the adequacy of the terms of a settlement, the trial

18   court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.")

19   Consequently, this factor supports approval of the Settlement.

20         **G.**    **Reaction of Class Members to the Proposed Settlement**

21         Class Members seem to have demonstrated a positive reaction to the Settlement in light of the

22   fact the Settlement Administrator received only for Requests for Exclusion forms. (Doc. 39-1 at 4,

23   Molina Decl. ¶11), and no objections were received by either the Settlement Administrator or the

24   Court. Significantly, "the absence of a large number of objections to a proposed class action

25   settlement raises a strong presumption that the terms of a proposed class action settlement are

26   favorable to the class members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529. Because the number of

27   requests for exclusion and objections received are vastly outweighed by the remaining class members

28   who have indicated their consent to the terms of settlement, this factor weighs in favor the settlement.

### H.    Collusion between Negotiating Parties

The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others. *Staton*, 327 F.3d at 960.  Plaintiff notes that the parties here "engaged the services of a highly respected mediator, negotiated over the span of a day of mediation and seven weeks of post-mediation discussions, and accepted a settlement premised on a mediator's proposal."  (Doc. 38 at 28)  The Ninth Circuit has determined the "presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Because there is no indication the agreement was the product of collusive conduct, this factor weighs in favor of approval of the Settlement.

## IV.    Conclusion

The factors set forth by the Ninth Circuit weigh in favor of final approval of the Settlement, which appears to be is fair, reasonable, and adequate as required by Rule 23.  Therefore, final approval of the Settlement Agreement is **GRANTED**.

### REQUEST FOR ATTORNEYS' FEES AND COSTS

Attorneys' fees and nontaxable costs "authorized by law or by agreement of the parties" may be awarded pursuant to Rule 23(h).  The Settlement authorizes Class Counsel to seek attorneys' fees that do "will not exceed 33.3% of the Gross Fund Value."  (Doc. 38-1 at 23, Settlement § 3.1)  Here, Class Counsel requests "an award of 33 1/3% of the gross settlement amount, or $100,000."  (Doc. 37 at 10)

Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded their fees and costs from the fund. *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and as such application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Boeing Co.*, 444 U.S. at 478.  Here, the Settlement applies distribution formulas to determine the amount paid

16

1   to participating Class Members, and application of the common fund doctrine is appropriate.

2   **I.      Legal Standards**

3           "[A] district court must carefully assess the reasonableness of a fee amount spelled out in a

4   class action settlement agreement" to determine whether the request is "fundamentally fair, adequate,

5   and reasonable." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed.R.Civ.P. 23(e)).

6   To do so, the Court must "carefully assess the reasonableness of a fee amount spelled out in a class

7   action settlement agreement." *Id*.

8           A court "may not uncritically accept a fee request," but must review the time billed and assess

9   whether it is reasonable in light of the work performed and the context of the case.  *See Common Cause*

10  *v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d

11  248, 254 n.5 (9th Cir. 1995) (noting a court may not adopt representations regarding the reasonableness

12  of time expended without independently reviewing the record); *Sealy, Inc. v. Easy Living, Inc.*, 743

13  F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request where

14  "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing

15  party wholesale" and explaining a court should not "accept[] uncritically [the] representations

16  concerning the time expended").

17          The party seeking fees bears the burden of establishing that the fees and costs were reasonably

18  necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th

19  2000).  Therefore, a fee applicant must provide time records documenting the tasks completed and the

20  amount of time spent.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins.*

21  *Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the

22  district court may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

23          Significantly, when fees are to be paid from a common fund, as here, the relationship between

24  the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys.*

25  *Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

26          [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has
            become a claimant against the fund created for the benefit of the class. It is obligatory,
27          therefore, for the trial judge to act with a jealous regard to the rights of those who are
            interested in the fund in determining what a proper fee award is.
28

*Id.* at 1302 (internal quotation marks, citation omitted).  As a result the district court must assume a fiduciary role for the class members in evaluating a request for an award of attorney fees from the common fund.  *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

The Ninth Circuit determined both a lodestar and percentage of the common fund calculation "have [a] place in determining what would be reasonable compensation for creating a common fund." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Whether the Court applies the lodestar or percentage method, the Ninth Circuit requires "fee awards in common fund cases be reasonable under the circumstances."  *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *see also Staton*, 327 F.3d at 964 (fees must be "fundamentally fair, adequate, and reasonable").

### A.    Lodestar Method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate."  *Florida* , 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433).  The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008).  Next, the Court may adjust the lodestar upward or downward using a "multiplier" considering the following factors adopted by the Ninth Circuit in a determination of the reasonable fees:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).  However, the Court has since suggested that the fixed or continent nature of a fee and the "desirability" of a case are no longer relevant factors.  *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citing *Davis v. City of San Francisco*, 976 F.2d 1536, 1546 n.4 (9th Cir. 1992)).

///

1    **B.      Percentage from the common fund**

2         As the name suggests, under this method, "the court makes a fee award on the basis of some

3    percentage of the common fund." *Florida*, 915 F.2d at 545 n. 3; *see also Boeing Co. v. Van Gemert*,

4    444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than

5    himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award

6    from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without

7    contributing to its cost are unjustly enriched at the successful litigant's expense," and as such

8    application of the doctrine is appropriate "when each member of a certified class has an undisputed and

9    mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Boeing*

10   *Co.*, 444 U.S. at 478.

11        In the Ninth Circuit, the typical range of acceptable attorneys' fees is 20% to 30% of the total

12   settlement value, with 25% considered the benchmark.  *See Vizcaino v. Microsoft Corp., 290 F.3d*

13   *1043, 1047 (9th Cir. 2002)*; *Hanlon*, 150 F.3d at 1029 (observing "[t]his circuit has established 25 %

14   of the common fund as a benchmark award for attorney fees"); *In re Pacific Enterprises Securities*

15   *Litigation*, 47 F.3d 373, 379 (9th Cir. 1995) ("Twenty-five percent is the 'benchmark' that district

16   courts should award in common fund cases").  The percentage may be adjusted below or above the

17   benchmark, but the Court's reasons for adjustment must be clear.  *Paul, Johnson, Alston & Hunt v.*

18   *Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

19        To assess whether the percentage requested is reasonable, courts may consider a number of

20   factors, including "the extent to which class counsel achieved exceptional results for the class, whether

21   the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash

22   settlement fund, the market rate for the particular field of law (in some circumstances), the burdens

23   class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and

24   whether the case was handled on a contingency basis." *In re Online DVD-Rental Antitrust Litigation*,

25   779 F.3d 934, 954-55 (9th Cir. 2015) (internal quotation marks omitted).

26   **II.      Evaluation of the fees requested**

27        "The district court has discretion to use the lodestar method or the percentage of the fund

28   method in common fund cases." *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000) (quoting *In re*

*Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997)).   Notably, the Court must consider similar factors under either method.  *See Kerr*, 526 F.2d at 70; *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d at 954-55.  Further, the Court may "appl[y] the lodestar method as a crosscheck" to determine whether the percentage requested is reasonable. *Vizcaino*, 290 F.3d at 1050, n.5.

### A.      Time and labor required

Class Counsel provided a time sheet for the attorneys who worked on this action, including the number of hours and rates billed by each through the date of the filing their motion for an award of fees.  (*See* Doc. 37-1, Stafford Decl. Exh. 1)  The records provided by Class Counsel indicate they spent 371.70 hours on tasks related to this action, including research, discovery, drafting the complaint and an amended complaint, communicating "with approximately 20 putative class members," and negotiating a settlement.  (*See generally id.* at 3, 15-39)  However, given the total number of hours, there is no evidence that Mr. Stafford, Mr. Shanberg, or Mr. Bartz were precluded from other work because of the pendency of this litigation.

### B.      Results obtained for the class

Courts have recognized consistently that the result achieved is a major factor to be considered in making a fee award. *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994). Here, Plaintiff reports that the settlement of $300,000 "represents approximately a 67% recovery of the possible damages."  (Doc. 37 at 14)  Of the total award, "Class Members in Group 1 will receive $50, while those in Group 2 will receive approximately $350."  (*Id.*)  Class Counsel argues that these results "are substantial when compared to other cases pursuing claims under the FCRA, the ICRAA, and the CCRAA."  (*Id.*) As examples, Class Counsel identify cases from around the country where the settlement results range from $22.44 to $200 per class member:

- *Ellis v. Swift*, 3:13-CV-00473-JAG (E.D. Va. 2013) - $50 for Group 1; $50 less fees and costs for Group 2;

- *Singleton v. Domino's Pizza*, DKC 11-1823 (D. Md. 2012)- $38-$107 per class member;

- *Pitt v. Kmart*, 3:11-cv-697 (E.D. Va. 2013) - $29.50 - $59 per class member;

- *White v. CRST, Inc.*, 1:11 cv-2615 (N.D. Ohio 2012) – $125- $200 per person;

- *Bell v. US Express, Inc.*, 1:11-cv-00181 (E.D. Tn. 2013) - $22.44 per person;

- *Lavalle v. Chex Systems, Inc.,* 8:08-cv-01383 (C.D. Cal. 2011) - $82 per person;

- *Knights v. Publix Super Markets*, 3:14-cv-00720 (M.D. Tn. 2014) - $48.55 per person;

- *Ford, et al. v. CEC Entertainment, Inc. dba Chuck E. Cheese's*, No. 3:14-CV-677 JLS (JLB) (S.D. Cal. 2015) - $38 for some claimants, up to $101 for the remaining claimants.

(Doc. 37 at 14-15)  Further, Class Counsel report that "Defendants have indicated that they changed their background check policies after this case was filed, conferring a substantial non-monetary benefit on current and future applicants for employment with Defendants." (*Id.* at 15)  Accordingly, the Court finds these results are exceptional when compared to the results achieved in other actions, and support the request for fees exceeding the benchmark.  *See Vizcaino*, 290 F.3d at 1048 ( "[e]xceptional results are a relevant circumstance" to an adjustment from the benchmark).

### C.     Risk undertaken by counsel

The risk of costly litigation and trial is an important factor in determining the fee award. *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

Here, as discussed above, Plaintiff admitted that even if she were to prevail on a motion for class certification, she would face "substantial risk of incurring the expense of a trial without any recovery." (Doc. 32 at 33)  Class Counsel report, "From the outset of the litigation, Defendants maintained that the alleged violations at issue were not 'willful' as defined under the statutes." (Doc. 37 at 15)  They acknowledge "the technical violations upon which Plaintiff's claims were based may not have been enough to successfully pursue the case if the parties had not reached a settlement." (*Id.* at 15-16, citing, e.g., *Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794 (7th Cir. 2010) [defendant not liable for willful violation if its reading of the statute was objectively reasonable]; Syed v. M-I LLC, 2014 U.S. Dist. LEXIS 150748 at *8-10 (E.D. Cal. Oct. 22, 2014) (finding the defendant's inclusion of a liability waiver provision in an FCRA disclosure was not a willful violation)).

Further, Class Counsel contend the fee request is appropriate because they "agree[d] to take this

case on a contingency basis," which "includes the risk that Class Counsel would recover nothing for their time in the event Defendants successfully defended the case." (Doc. 37 at 17)  However, the Ninth Circuit held that the distinction between a contingency arrangement and a fixed fee arrangement alone does not merit an enhancement from the benchmark.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7. (9th Cir. 2011) ("whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees) (citation omitted).

Although Class Counsel admit that they may have faced a challenge to the merits of Plaintiff's claims, the case was not complex and Class Counsel did not face extreme risks in pursuing this litigation.  For example, in *Vizcaino*, the plaintiffs "lost in the district court—once on the merits, once on the class definition" and the class counsel twice "succeeded in reviving their case on appeal." *Id.*, 290 F.3d at 1303.  The court found the pursuit of the case was "extremely risky" given the absence of supporting precedents" and the challenges faced in the appeals. *Id.*  As such, the risks supported an award of fees slightly above the benchmark. *Id.* at 1048-49.  In contrast, here, though Defendants denied liability, settlement was achieved without contentious litigation, and Class Counsel were not faced with a challenge to merits of the claims or the propriety of class certification.

### D.   Complexity of issues and skill required

The complexity of issues and skills required may weigh in favor of a departure from the benchmark fee award. *See, e.g., Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *14-15 (E.D. Cal. Sept. 2, 2011) (in determining whether to award the requested fees totaling 28% of the class fund, the Court observed the case involved "complex issues of constitutional law," and the action "encompassed two categories of class members"); *see also In re Heritage Bond Litig.,* 2005 U.S. Dist. LEXIS 13555, at *66 (C.D. Cal. June 10, 2005) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award").

Class Counsel contend they "have extensive litigation experience and have successfully handled class actions as well as individual claims involving complex matters for several years." (Doc. 37 at 16-17) They assert, "This experience led to the successful resolution of this case, which resulted in not only compensation for all Class Members, without any reversion to Defendants, but also policy changes by Defendants to ensure compliance with the state and federal statutes and to protect future applicants

22

from the violations alleged in the instant case." (*Id.* at 17)  Accordingly, this factor supports the fees requested by Class Counsel.

### E.  Length of professional relationship

Class Counsel report that Plaintiff first contacted them in April 2014.  (Doc. 37 at 17; *see also* Doc. 37-1 at 15)  The parties executed a memorandum of understanding on May 12, 2015, and finalized the proposed settlement on June 10, 2015.  (Doc. 32-1 at 57-60)  Class Counsel acknowledge "the length of the litigation was not overly extensive," but assert this "should not be a negative factor." (Doc. 37 at 17)  Rather, Class Counsel argues that this "shows that Plaintiff and Class Counsel were able to efficiently and effectively litigate the case to achieve a settlement that compensates Class Members better than most other settlements in these types of cases." (*Id.* at 18)  However, the short duration of the professional relationship may warrant an award below the benchmark.  *See Six Mexican Workers*, 904 F.2d at 1311 (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

### F.  Awards in similar cases

Class Counsel contend that "Courts in the Eastern District have granted fee awards of 30% - 33.3% in other class actions, thereby exceeding the 'benchmark' of 25%." (Doc. 37 at 18)  As examples, Class Counsel identify *Benitez v. Wilbur*, No. 08-cv-1122-LJO-GSA (E.D. Cal. Dec. 15, 2009) (awarding 33.3% of the common fund in fees) and *Alvarado. v. Nederend*, No. 1:08-cv-01099 OWW-DLB (E.D. Cal. May 17, 2011) (awarding 33.3% of the common fund in fees).  Class Counsel assert also that "courts in FCRA cases have awarded fees in excess of 25%, even in cases that resulted in lower compensation amounts to the class members." (Doc. 37 at 18)  Specifically, Class Counsel report: "[I]n *Ellis*, *supra*, the court awarded 30%; and in *Pitt*, supra, the court awarded 30%.  Moreover, in other FCRA cases in which the court only awarded 25%, the results obtained were less than those obtained herein. *See Singleton*, *supra*, in which the court awarded 25% fees when class members received between $38-$107; and *Lavalle*, *supra*, in which the court awarded 25% when class members received $82 per person." (Doc. 37 at 18)

However, Class Counsel has not explain how the cases identified are similar to this matter beyond the fact that the plaintiffs pursued claims on behalf of a class.  For example, in *Ellis*, the

23

attorneys worked for 2,266 hours on the matter, prosecuting the matter on behalf of 180,998 class members.  (*Id.*, Case No. 3:13-cv-0743-JAG, Docs. 56, 59)  Although each class member received only $50, the settlement fund totaled $5,053,500.00.  The lodestar amount totaled $851,506, so the requested fees of 30% would result in a multiplier of 1.74.  (*Ellis*, Doc. 56 at 29)  The court did not identify the factors considered, but found the fees requested were "fair and reasonable under Fourth Circuit standards."[4]  (*Ellis*, Doc. 59 at 7)

### G.    Lodestar Crosscheck and Market Rate

In general, the first step in determining the lodestar is to determine whether the number of hours expended was reasonable.  *Fischer*, 214 F.3d at 1119.  However, when the lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours."  *See Schiller v. David's Bridal, Inc.*, 2012 WL 2117001 at *20 (E.D. Cal. June 11, 2012) (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005); *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166 (S.D. Cal. 2007)).

Assuming the hours reported are reasonable[5], the Class Counsel reports the resulting lodestar is $193,927.00.  (*See* Doc. 37-1 at 8, Stafford Decl. ¶ 23)  However, the hourly fees used to calculate this amount must be reduced to reflect the market rate within this community.  The Supreme Court explained that attorney fees are to be calculated with "the prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984).  In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  Thus, when a case is filed in the Fresno Division of the Eastern District of California, "[t]he Eastern District of California, Fresno Division, is the appropriate forum to establish the lodestar hourly rate . . ." *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

Class Counsel acknowledge that "[t]he prevailing market rates in the Eastern District appear to

---

[4] Notably, the Fourth Circuit has not established a benchmark award for attorney fees.  *Boyd v. Coventry Health Care, Inc.*, 299 F.R.D. 451, 464 (D. Md. 2014).

[5] A "lodestar cross-check calculation need entail neither mathematical precision nor bean-counting."  *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306.  Nevertheless, the Court has reviewed the time sheets and finds the tasks reported relate solely to this litigation, and it does not appear Class Counsel engaged in practices that would result in over-billing.

be 'between $250 and $380, with the highest rates generally reserved for those attorneys who are regarded as competent and reputable and who possess in excess of 20 years of experience.'" (Doc. 37 at 19, quoting *Silvester v. Harris*, 2014 U.S. Dist. LEXIS 174366, 2014 WL 7239371 at *4 (E.D. Cal. Dec. 17, 2014))  Accordingly, Class Counsel reduced their hourly rates to $325 for partners who have been practicing law for 14 years to 20 years, and $200 for an associate, which resulted in an adjusted lodestar of $119,965.00.[6] (Doc. 37-1 at 10, Stafford Decl. ¶ 26)  Thus, the fees requested by Class Counsel are less than the lodestar.

### III.     Amount of Fees to be Awarded

Significantly, there is a strong presumption that the lodestar is a reasonable fee.  *Gonzalez*, 729 F.3d at 1202; *Camacho*, 523 F.3d at 978.  Because the fees requested are significantly below the lodestar, and the results obtained on behalf of the class are greater than those in comparable cases, the Court finds the fees requested are fair and reasonable.  Accordingly, Class Counsel's request for attorney fees is **GRANTED** in the amount of 33.3% of the Settlement fund, or $100,000.

### REQUESTS FOR COSTS

### I.     Litigation Expenses

Reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  Class Counsel were previously authorized to seek "costs up to $8,500." (Doc. 34 at 17)  Mr. Stafford report that as of the filing of his supplemental declaration on September 16, 2015, they incurred $6,407 in costs. (Doc. 39 at 2, ¶3; *see also* Doc. 37-2 at 43)  In addition, Class Counsel assert they "anticipate[] additional costs will be incurred for filing fees for this motion and the motion for final approval, as well as travel to the courthouse for the hearing on September 25, 2015, and any other final invoices from vendors and/or experts related to this case." (Doc. 37 at 21)  Accordingly, they estimate they will incur a total of $7,250 in costs, and seek an award of that amount. (*Id.*)

Previously, this Court noted cost "including filing fees, mediator fees …, ground transportation,

---

[6] This total includes 365 hours for partners and 6.7 hours for the associate. (Doc. 37-1 at 10, Stafford Decl. ¶ 26)

copy charges, computer research, and database expert fees ... are routinely reimbursed in these types of cases." *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011).  Review of the expenses identified by Mr. Stafford demonstrates the actual costs for the initial filing fee, legal research, travel for purposes of mediation, and photocopying of documents are reasonable.  However, there were no filing fees for the filing of this motion or the motion for final approval, and the hearing on the motion was vacated.  Finally, Class Counsel have not identified any outstanding invoices from "vendors and/or experts," and the Court declines to speculate as to the totals.  Accordingly, the request for litigation costs is **GRANTED IN PART** in the modified amount of $6,407.00**.**

## II.     Costs of Settlement Administration

Previously, the Court ordered that the "[c]osts of settlement administration shall not exceed $12,500."  (Doc. 34 at 17)  Ms. Molina reports that ILYM Group has incurred $4,073.39 in costs, and anticipates another $9,017.84 for tasks such as printing checks, postage, and preparing and filing tax reports on the payments.  (Doc. 39-1 at 21)  Despite the anticipated total of $13,091.23 in expenses, ILYM Group seeks an award of $10,000.  (*Id.* at 4; Doc. 37-3 at 2)

The administrative expenses requested are reasonable in light of costs for claims administration awarded in this District. *See, e.g, Bond v. Ferguson Enterprises, Inc.*, 2011 WL 2648879, at *8 ($18,000 settlement administration fee awarded in wage an hour case involving approximately 550 class members); *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 483-84 (E.D. Cal. 2010) ($25,000 settlement administration fee awarded in wage and hour case involving approximately 170 potential class members).  Accordingly, the request for $10,000 in administration expenses for the settlement administration by ILYM Group is **GRANTED**.

## PLAINTIFF'S REQUEST FOR AN INCENTIVE AWARD

Plaintiff seeks an incentive award of $5,000 for her actions as the class representative.  (Doc. 27 at 24) In the Ninth Circuit, a court has discretion to award a class representative a reasonable incentive payment.  *Staton*, 327 F.3d at 977; *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463.  Incentive payments for class representatives are not to be given routinely.  In *Staton*, the Ninth Circuit observed,

Indeed, '[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard."

1

2

> *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); *see also Women's Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76 F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what amounts to a separate peace with defendants, grave problems of collusion are raised.").

3

4    *Id.* at 975.  In evaluating a request for an enhanced award to a class representative, the Court should

5    consider all "relevant factors including the actions the plaintiff has taken to protect the interests of the

6    class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort

7    the plaintiff expended in pursuing the litigation . . . and reasonable fears of workplace retaliation."  *Id.*

8    at 977.  Further, incentive awards may recognize a plaintiff's "willingness to act as a private attorney

9    general."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

10       **A.**    **Actions taken to benefit the class**

11          Pursuant to the terms of the Settlement, the incentive award is to be given to Plaintiff "to

12   compensate her for her time and efforts spent in serving as the Class Representative."  (Doc. 38-1 at 25,

13   Settlement § 3.3)  Plaintiff reports she assisted in the preparation of the complaint in the action; assisted

14   with the discovery process "by compiling a list of potential witnesses and documents" and "attempting

15   to locate former employees of Defendants to assist with obtaining witness statements and/or

16   declarations;" and conferring with her attorneys.  (Doc. 37-2 at 4-5, De Santos Decl. ¶¶ 4-8)  Plaintiff

17   reports she attended the mediation in Los Angeles, and "incurred out-of-pocket expenses the amount of

18   $105, which included parking and mileage from Riverside to Los Angeles and back."  (*Id.* at 4, ¶ 10)

19   Notably, Plaintiff would have assisted in much of these same actions to the same extent regardless of

20   whether the action was brought on behalf of the class or she only pursued her own claims against

21   Defendants.  Nevertheless, undoubtedly, her actions benefitted the class such that they weigh in favor

22   of an incentive payment.

23       **B.**    **Time expended by Plaintiff**

24          Plaintiff reports that she spent approximately 40 hours on the tasks identified above, including

25   approximately 10 hours for the mediation.  (*See* Doc. 37-2 at 5-6, De Santos Decl. ¶¶10, 13)  Because

26   Plaintiff provided assistance with discovery, reviewed documents prepared by Counsel and produced

27   by Defendants, and attended the mediation in Los Angeles, this factor weighs in favor of an incentive

28   payment to Plaintiff.  However, the limited amount of time expended by Plaintiff in the course of the

litigation does not support the amount requested.

### C.   Fears of workplace retaliation

Plaintiff reports she "was not fearful of being retaliated against by Defendants themselves, considering she was rejected from employment by Defendants."  (Doc. 37 at 24)  On the other hand, Plaintiff asserts she "was fearful of other employers learning of her status as a class representative and, therefore, refusing to interview or hire her."  (*Id.*)  Plaintiff explains, "[M]y name and status in this lawsuit are obvious when I search on the internet. When I search my name on Google, this case comes up in the first page of hits. As a result, I fear I will be retaliated against by future employers. In fact, I was not able to obtain full time employment for seven months after being rejected by Defendants and deciding to pursue this case."  (Doc. 37-2 at 8, De Santos Decl. ¶17)

However, the fear that a *prospective* employer may not hire Plaintiff based upon her actions taken in this litigation— against a company for which Plaintiff never worked—does not demonstrate a reasonable fear of workplace retaliation and, instead, is pure speculation.  Moreover, the fact that Plaintiff has since obtained employment despite the pendency of this litigation undermines her assertions.  Accordingly, this factor does not support an award of an incentive payment.

### D.   Reasonableness of Plaintiff's request

Considering the actions taken by Plaintiff on behalf of the class, an incentive award is appropriate.  In determining the amount to be awarded, the Court may consider the time expended by the class representative, the fairness of the hourly rate, and how large the incentive award is compared to the average award class members expect to receive.  *See, e.g., Ontiveros v. Zamora*, 2014 WL 5035935 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 U.S. Dist. LEXIS 72250, at *5 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff).  Here, considering these factors, the $5,000 award that Plaintiff requests is out of proportion to the efforts made and time expended.

#### 1.   Time expended

In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to

28

Sacramento for mediation sessions; (2) assisted Counsel in investigating and substantiating the claims alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation." *Id.*, 2011 WL 1883188 at *11.  Further, the Court noted the plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for the costs awarded in favor of the Defendant." *Id.*  In light of these facts, the Court found an award of $7,500 for each plaintiff was appropriate for the time, efforts, and risks undertaken.

Similarly, in *Bond*, the Court found incentive payments of $7,500 were appropriate for the two named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5) and prepared and evaluated the case for mediation, which was a full day session requiring very careful consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the Class." *Bond*, 2011 WL 2648879, at *15.

In this case, Plaintiff asserts she spent approximately 40 hours on tasks related to this litigation, including assisting with the preparation of the complaint, locating and reviewing documents, and attending mediation.  On the other hand, she did not "endure lengthy interviews," was not required to submit to a deposition, and only prepared declarations related to the approval of the settlement terms and the request for an incentive award.  Consequently, an award of $5,000 would be excessive.

### 2.    Fairness of the hourly rate

Recently, this Court criticized a requested award of $20,000 where the plaintiff estimated "he spent 271 hours on his duties as class representative over a period of six years," because the award would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 2014 WL 5035935 at *5-6. The Court explained that "[i]ncentive awards should be sufficient to compensate class representatives to make up for financial risk . . . for example, for time they could have spent at their jobs." *Id.* at *6 (citing *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  The Court found an award of "$50 per hour fairly compensate[] the named plaintiff for his time and incorporates an extra incentive to participate in litigation," considering that the plaintiff's hourly flat rate while employed by the defendant was $15 per hour. *Id.* at *6; n.3.  Nevertheless, the Court

29

1    increased the award from $13,550 (calculated with $50 per hour for the 271 hours) to $15,000 because

2    "Mr. Ontiveros relinquished the opportunity to bring several of his own claims." *Id.* at *6.

3            Here, with the estimated 40 hours of tasks taken by Plaintiff, the requested award of $5,000

4    would compensate Plaintiff at a rate of $125 per hour.  If the Court were to adopt the $50 per hour rate

5    recently approved in *Ontiveros*, Plaintiff's incentive award would be reduced to $2,000.[7]

6                    3.    Comparison of the award to those of the Class Members

7            *In Rankin*, the Court approved an incentive award of $5,000, where the "[p]laintiff retained

8    counsel, assisted in the litigation, and was an active participant in the full-day mediation." *Id.*, 2011

9    U.S. Dist. LEXIS 72250, at *5.  The Court found the amount reasonable, in part because "the sum is

10   reasonably close to the average per class member amount to be received." *Id.*  In contrast, here Plaintiff

11   seeks an award of $5,000, while Class Members in Group I will receive $50 each, and Class Members

12   in Group II "will receive approximately $350." (Doc. 38 at 10-11)  Thus, the requested incentive award

13   is disproportionate to the awards Class Members expect to receive.

14       **E.    Amount to be awarded**

15           In light of the efforts expended by Plaintiff, the average award expected to be received by the

16   class members, the Court finds $2,500 is an appropriate incentive award.  With an hourly rate of $50

17   per hour, Plaintiff would be entitled to an award of $2,000, but a slight increase of the award is

18   appropriate to reflect the fact that Plaintiff released more claims as part of the settlement than the Class

19   Members.  *See Ontiveros*, 2014 WL 5035935 at *5-6.  Thus, Plaintiff's request for an incentive

20   payment is **GRANTED** in the modified amount of $2,500.

21                           **CONCLUSION AND ORDER**

22           For the reasons set forth above, the Court finds the Settlement is fair, adequate, and reasonable

23   as required by Rule 23(e)(2) of the Federal Rules of Civil Procedure.

24           Based upon the foregoing, **IT IS HEREBY ORDERED**:

25       1.       Plaintiff's motion for final approval of the Settlement Agreement is **GRANTED**;

26       2.       Plaintiffs' request for certification of the Settlement Class is **GRANTED** and defined

27

28           [7] Notably, Plaintiff asserts that the position for which she applied would have paid "approximately $54.88/hour," and at that rate her "enhancement would be $2,115.20" (Doc. 37 at 26)

as follows:

> All applicants who applied for employment with Jaco Oil Company; Fastrip Food Stores, Inc.; Fastrip Food Stores of Fresno, Inc.; Fastrip Financial, LP; Instant Storage, LLC, Brooke Utilities, Inc.; and Wholesale Fuels, Inc. and for whom Defendants obtained and/or used a Consumer Report from May 16, 2009 to July 17, 2015.

3.   Plaintiff's request for a class representative incentive payment is **GRANTED IN PART** in the modified amount of $2,500;

4.   Class Counsel's motion for attorneys' fees is **GRANTED** in the amount of $100,000, which is 33.3% of the gross settlement amount;

5.   Class Counsel's request for costs is **GRANTED NI PART** in the modified amount of $6,407.00;

6.   The request for fees for the Claims Administrator ILYM Group, Inc. in the amount of $10,000 is **GRANTED**; and

7.   The action is dismissed with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court; and

8.   The Court hereby retains jurisdiction to consider any further applications arising out of or in connection win the Settlement.

IT IS SO ORDERED.

Dated:   __September 29, 2015__          _____ **/s/ Jennifer L. Thurston**
                                       UNITED STATES MAGISTRATE JUDGE

31